

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-18-00515-CV

**SOUTHCROSS ENERGY PARTNERS GP, LLC**,
Appellant/Cross-Appellee

v.

Ivy **GONZALEZ** on Behalf of M.R. Gonzalez, M.N. Gonzalez, Minor Children, and the Estate
of Jesus Gonzalez, Jr.; Amy Gonzalez; Jesus Gonzalez, Sr.; and Rene Elizondo,
Appellees/Cross-Appellants[1]

From the 229th Judicial District Court, Duval County, Texas
Trial Court No. DC-16-139
Honorable Sandra L. Watts, Judge Presiding[2]

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:    Luz Elena D. Chapa, Justice
Irene Rios, Justice
Liza A. Rodriguez, Justice

Delivered and Filed: February 24, 2021

AFFIRMED IN PART, REVERSED AND RENDERED IN PART

This is a personal injury case arising out of an explosion on the property of appellant

Southcross Energy Partners GP, LLC, during repair work on Southcross's gas pipeline. The

appellees, and the plaintiffs in the trial court, are the estate and family members of Jesus Gonzalez,

---

[1] Rene Elizondo is the only appellee who is not a cross-appellant.

[2] Sitting by assignment. Judge Sandra L. Watts presided over some of the post-trial proceedings and signed the final judgment. The Honorable Ana Lisa Garza, Former Presiding Judge of the 229th Judicial District Court, presided over the trial proceedings and some of the post-trial proceedings.

Jr., who died from injuries caused by the explosion, and Rene Elizondo, who was severely injured. Southcross appeals the money judgment the trial court rendered in appellees' favor after a jury trial, seeking reversal and rendition of a take-nothing judgment. The Gonzalezes cross-appeal the judgment, seeking reversal and a remand for a new trial. We affirm as to compensatory damages, but reverse and render as to the exemplary damages.

## FACTUAL BACKGROUND

Southcross owns and operates a gas pipeline traversing Duval County. To replace a valve on the pipeline, Southcross decided to perform hot taps. A hot tap is a procedure by which a machine is used to cut into a gas pipeline while gas is still flowing through it. According to the American Petroleum Institute (API)[3]:

> Hot tapping is the technique of attaching a welded branch fitting to piping or equipment in service, and then creating an opening in that piping or equipment by drilling or cutting a portion of the piping or equipment within the attached fitting. . . . . Hot tapping is usually performed when it is not feasible, or is impractical, to take the equipment or piping out of service, or to purge or clean it by conventional methods. With proper review to determine that a hot tap is appropriate, and development and conformance to job-specific procedures, many hot tap connections have been safely made without interfering with the process operation.

The API acknowledges the "risk that hot work may provide a source of personnel exposure or ignition hazards which could lead to a fire or explosion." Southcross's Safety Manual, which contains written procedures for performing hot taps, also begins by acknowledging that hot taps are "exceptionally dangerous."

The API has recommended standards under which hot taps should be performed only as a last resort after considering various factors. Before conducting a hot tap, the API standards recommend that operators consider the following questions, in the following order:

---

[3] The trial court admitted into evidence a copy of the API's 2003 publication "Safe Hot Tapping Practices in the Petroleum & Petrochemical Industries."

1. Is Service Continuity Essential?
2. Is System Shutdown Impractical?
3. Are Written Hot Tap Procedures Available?
4. Is Needed Special Equipment Available?
5. Will Equipment Provide Proven Effective Protection for Employees?

If any question is answered in the negative, the API standards instruct operators to proceed with an alternative to hot tapping.

When Southcross decided to replace the valve, none of Southcross's employees were trained or qualified to perform hot taps. Southcross also lacked the necessary equipment. Southcross received a bid from Furmanite[4] to perform the hot taps and repairs for the valve replacement project. Furmanite had experience in performing hot taps and owned a hot tap machine. To obtain approval for the expenses, an Authorization for Expenses (AFE) form was prepared and emailed to Southcross's highest corporate safety officer, William Boyer, in Harris County. Boyer and two other Southcross supervisors approved the expenses via email that same morning. None of the written correspondence reflected any consideration of the API standards for determining whether to proceed with an alternative to hot tapping.

For assistance with performing the hot taps, Furmanite subcontracted with another company, Galbraith Contracting, to transport Furmanite's hot tap machine and connect the machine to Southcross's pipeline. On the day the work was to be performed, Southcross failed to issue a hot tap permit, as required by Southcross's written safety procedures. Furthermore, Furmanite's hot tap machine was not properly maintained by Furmanite and was not pressure tested before the hot taps, as required by Furmanite's safety policies. Also, to keep its bid lower,

---

[4] "Furmanite" refers collectively to the Furmanite Corporation and other entities that were named defendants but settled before trial.

Furmanite sent only one hot tap technician when its policies required two such technicians based on the project specifications.

Five people were present at the job site where the hot taps were performed. Jacob Baker, Furmanite's hot tap technician, performed two hot taps using Furmanite's hot tap machine. Galbraith sent a crew consisting of Severo Sepulveda, the foreman, and Gonzalez and Elizondo as manual laborers to assist with "digging and bolting." Also present was Southcross's construction coordinator Dennis Henneke, who had assisted in preparing the cost estimate for the AFE form and who was overseeing Furmanite's work on the pipeline.

Baker performed the first hot tap without incident. The second hot tap, however, required manually rotating a crank on the machine. During the second hot tap, Baker became fatigued. Henneke, a Southcross employee who was not licensed, trained, or experienced in performing hot taps, took over for Baker, and started operating Furmanite's machine. When Henneke started struggling with Furmanite's machine, Sepulveda directed Gonzalez and Elizondo to assist Henneke. The machine overpressurized from a combination of the mechanical pressure within the machine and the pressure from the live gas pipeline, but Henneke did not make proper adjustments to the machine. The hot tap machine then exploded, killing Henneke and Gonzalez and severely injuring Elizondo's leg.

### PROCEDURAL BACKGROUND

The Gonzalezes and Elizondo sued Furmanite and Southcross. Furmanite settled, and the claims against Southcross proceeded to a jury trial. The jury returned findings in favor of the Gonzalezes and Elizondo as to Southcross's liability for negligence and gross negligence and found specific dollar amounts for various elements of compensatory damages, as well as punitive damages.

Southcross filed a motion for judgment notwithstanding the verdict, challenging the sufficiency of the evidence to support the jury's findings and raising other issues. The Gonzalezes filed a motion for new trial, arguing one of the jurors was disqualified because she did not reside in Duval County. The trial court denied both motions.

The trial court rendered a final judgment in favor of the Gonzalezes and Elizondo. The compensatory damages found by the jury were offset almost entirely by a settlement credit. On appeal, Southcross challenges the jury's liability findings. The Gonzalezes cross-appeal, arguing the trial court erred by denying their motion for new trial.

### SOUTHCROSS'S APPEAL

Southcross raises three issues: (1) there is legally insufficient evidence of a duty owed to Gonzalez and Elizondo; (2) there is legally insufficient evidence of gross negligence; and (3) alternatively, the trial court misapplied the damages cap on exemplary damages in Chapter 41 of the Civil Practice & Remedies Code by treating the Gonzalezes as a single claimant.

### A. Sufficiency of the Evidence

The evidence is legally insufficient when "(a) [there is] a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact." *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015). Without an objection to the jury charge, we measure the legal sufficiency of the evidence against the jury charge as given. *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001).

#### 1. *Negligence Liability for Compensatory Damages*

In response to a broad-form general negligence question, the jury found Southcross's negligence proximately caused Gonzalez's and Elizondo's injures. The jury also made special-

issue findings that Southcross's failure to ensure a qualified crew performed the hot tap proximately caused the injuries, and that the work involved a special danger, a peculiar risk, and a grave risk of serious harm. "A negligence cause of action has three elements: (1) a legal duty, (2) breach of that duty, and (3) damages proximately caused by the breach." *Carrera v. Yañez*, 491 S.W.3d 90, 94 (Tex. App.—San Antonio 2016, no pet.). Southcross challenges only the duty element. Duty is a threshold question of law, decided from the facts surrounding the occurrence in question. *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 503 (Tex. 2017).

### a. The Parties' Arguments

Southcross argues it owed no duty to Gonzalez and Elizondo to ensure its independent contractor and subcontractor (Furmanite and Galbraith) exercised ordinary care in performing or assisting in performing the hot taps. Southcross contends no evidence shows it exercised any control over the hot taps, and the jury's special issue-findings are immaterial and not supported by legally sufficient evidence. The Gonzalezes and Elizondo argue Southcross owed them a duty because of its own acts and omissions, not necessarily based on the acts and omissions of a contractor, and further, the evidence supports the jury's findings.

The Gonzalezes and Elizondo argue we need not address the duty-related rules regarding independent contractors because their primary theory of negligence is direct liability through Boyer's negligent failure to comply with the API standards to consider alternatives to hot taps before approving expenses for the hot taps. Southcross indirectly responds to this argument in its challenge to the gross negligence finding, by contending the evidence conclusively establishes Boyer did consider alternatives to hot taps and there is no evidence that he failed to consider alternatives as required by the API standards.

### b. Applicable Rules

Generally, a landowner owes no duty "to see that an independent contractor performs work in a safe manner." *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985). There are at least two exceptions; one exception is when the landowner "exercises some control" over a contractor's work. *See id.* A second exception is when the "work itself involves a nondelegable duty, whether inherently dangerous or statutorily prescribed." *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 795 (Tex. 2006).

However, a landowner may owe a business invitee "a duty not to injure the invitee through contemporaneous negligent activity." *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 215 (Tex. 2015). An employee of a contractor performing work on the landowner's premises is a business invitee. *Smith v. Henger*, 226 S.W.2d 425, 431 (Tex. 1950). The acts of a landowner's employees within the course and scope of their employment are attributable to the landowner. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007). When courts have not yet addressed whether a duty exists under the facts surrounding the occurrence in question, courts must address whether a duty should be recognized by weighing public policy considerations. *See Pagayon*, 536 S.W.3d at 503.

### c. Evidence of a Duty Without Considering the Rules for Independent Contractors

We first consider whether Boyer owed a duty to Gonzalez and Elizondo when he approved expenses for a hot tap. Boyer approved the expenses for hot taps on February 12, 2016. Gonzalez's and Elizondo's injuries did not occur until two months later, on April 12, 2016, during the second hot tap. Boyer's approval of expenses is therefore not a contemporaneous activity causing Gonzalez's and Elizondo's injuries, and no party has argued this case presents any premises liability theories. *See United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 471 (Tex. 2017)

(explaining the difference between general ordinary negligence and premises liability). The Gonzalezes and Elizondo cite no authority establishing that when a defendant's corporate safety officer approves expenses for a contractor, the defendant owes a duty to a subcontractor's employees, who have not yet been hired to perform any work and who have not yet entered the company's property. Conversely, Southcross cites no authority that such a duty does not exist, and Southcross does not squarely respond to this theory of direct negligence. To the extent we can liberally construe Southcross's arguments about Boyer having considered alternatives to hot taps on the matter of gross negligence as applying to the issue of ordinary negligence, Southcross's arguments relate to the element of breach, not duty; and Southcross does not challenge the sufficiency of the evidence supporting the breach element of the jury's ordinary negligence findings. *See Kenyon v. Elephant Ins. Co.*, No. 04-18-00131-CV, 2020 WL 1540392, at *5 (Tex. App.—San Antonio Apr. 1, 2020, pet. filed) (explaining the difference between duty and breach elements of negligence).

We conclude we need not address whether Boyer owed Gonzalez and Elizondo a duty when he approved the expenses for the hot tap because courts have already recognized the existence of a duty owed by a landowner to business invitees. Gonzalez's and Elizondo's injuries occurred at a gas processing facility owned by Southcross. Southcross is therefore a landowner owing a duty to business invitees. *See Kroger*, 465 S.W.3d at 215. Because Gonzalez and Elizondo were employees of a subcontractor performing work for Southcross on its property, they were business invitees. *See Smith*, 226 S.W.2d at 431. The acts of Henneke, a Southcross employee, during the hot tap were attributable to Southcross because Henneke was working as the construction supervisor and coordinator for Southcross and working on Southcross's valve replacement project. *See Mayes*, 236 S.W.3d at 757. Thus, while Henneke was using the hot tap machine, Southcross owed Gonzalez and Elizondo a duty not to injure them through Henneke's

contemporaneous activity. *See Kroger*, 465 S.W.3d at 215. Legally sufficient evidence therefore shows Southcross owed Gonzalez and Elizondo a duty in support of their respective causes of action for negligence.

### d. Evidence of a Duty Under the Rules for Independent Contractors

Southcross argues it owed no duty because: (1) the injuries were caused by the acts and omissions of a contractor, Furmanite; (2) Southcross did not have actual or contractual control over Furmanite's work; (3) the exceptions for nondelegable duties, including mandatory safeguards or precautions and peculiar risks, do not apply; and (4) the jury's findings are not supported by legally sufficient evidence. We hold these independent contractor rules are inapposite because legally sufficient evidence shows Southcross owed Gonzalez and Elizondo a duty based on an employee's contemporaneous activity. *See id.* But, in an abundance of caution, we address Southcross's arguments regarding the duty rules for contractors.

Even if the general "no duty" rule for contractors were applicable, we alternatively hold the record establishes several exceptions to this rule. The undisputed evidence shows that when Baker became fatigued, Henneke assumed control of the operation of the hot tap machine and performed Furmanite's work himself. A Southcross employee therefore exercised some control over the manner in which Furmanite's work was performed. *See Redinger*, 689 S.W.2d at 418. At oral argument, Southcross argued a separate question on control was not submitted to the jury. However, in its briefing and at oral argument, Southcross did not cite any authorities or provide any explanation for why the broad-form, general negligence question on the issue of control was an improper question to submit to the jury. *See* TEX. R. APP. P. 38.1(i); *United Scaffolding*, 537 S.W.3d at 471 (stating that generally, unless the plaintiff's negligence theory is premises liability, "a plaintiff need only submit a general-negligence question in support of its claim for a defendant's liability under a negligent-activity theory"). Furthermore, Southcross admitted at oral argument it

is undisputed Henneke was operating the hot tap machine and performing work Furmanite was hired to perform when the machine exploded; thus, a separate finding specifically on Southcross's control over Furmanite's work was unnecessary. *See Sullivan v. Barnett*, 471 S.W.2d 39, 44 (Tex. 1971) ("Submission of an issue on an undisputed fact is unnecessary.").[5]

Alternatively, Southcross was required to ensure the "tap made on a pipeline under pressure [was] performed by a crew qualified to make hot taps," 49 C.F.R. § 192.627, and this "qualified crew" requirement is therefore a nondelegable duty. *See Fifth Club*, 196 S.W.3d at 795 (stating a duty is nondelegable when it is imposed by law because of concerns for public safety). The jury found Southcross's failure to ensure a qualified crew performed the hot tap proximately caused Gonzalez's and Elizondo's injuries. Southcross argues the jury's answer to the "qualified crew" question must be disregarded because the question is not "tied to" the question on negligence. Southcross cites no authority and does not argue why jury questions must be "tied to" each other to be valid. *See* TEX. R. APP. P. 38.1(i). Instead, we must harmonize jury findings and construe them together to support the judgment when possible. *Bender v. S. Pac. Transp. Co.*, 600 S.W.2d 257, 260 (Tex. 1980).

Southcross argues the jury's qualified crew finding must be disregarded because the federal requirement that hot taps be performed by a qualified crew is not sufficiently specific. First, by not raising this specific objection in the trial court, Southcross did not preserve this complaint for appeal. *See* TEX. R. APP. P. 33.1(a). Second, Southcross cites no authority squarely holding a safety requirement does not give rise to a nondelegable duty if the governing language is too general. *See*

---

[5] During the charge conference, Southcross objected to the lack of an instruction defining "control" in the general negligence question. Southcross does not complain of charge error on appeal. Nevertheless, in considering this issue as an alternative holding, we have measured the legal sufficiency of the evidence against the legal principles governing a landowner's control over a contractor's work, despite the absence of an instruction relating to control in the general negligence question submitted to the jury.

*id.* Third, in *MBank El Paso, N.A. v. Sanchez*, the supreme court held a general requirement not to "breach the peace" created a nondelegable duty in repossessing a car. *See* 836 S.W.2d 151, 152–54 (Tex. 1992).[6] The specific requirement to ensure a qualified crew performs a hot tap is more definitive than a general requirement not to breach the peace. We cannot say the qualified crew requirement lacks sufficient specificity or that the jury's finding must be disregarded on this basis.

Legally sufficient evidence supports the qualified crew finding. Leslie Cole, a Furmanite employee, testified this particular job required two licensed hot tap technicians, but Furmanite provided only one technician—Baker—to keep its bid lower. Baker was unable to perform the hot taps and complete the job by himself without becoming fatigued. Henneke performed the second hot tap, and it is undisputed he was not qualified to do so. Sepulveda instructed Gonzalez and Elizondo to assist with the hot tap, and it is undisputed that Gonzalez and Elizondo were also not qualified to perform the hot tap.[7] Because a federal regulation established Southcross had a nondelegable duty to have a qualified crew perform the hot tap, Southcross had a duty to ensure a qualified crew performed the hot tap, even though it hired a contractor to perform the work. *See Fifth Club, Inc.*, 196 S.W.3d at 795.[8]

And, alternatively, we cannot hold—as a matter of law and as an issue of first impression—that hot taps are not inherently dangerous. The state of the record in this case precludes us from making such a holding. Boyer, Southcross's highest corporate safety officer, testified hot taps are

---

[6] Southcross relies on *MBank El Paso*, but quotes the analysis from the dissenting opinion.

[7] For the first time at oral argument, Southcross argued the failure to ensure a qualified crew performed the work was not a proximate cause of the plaintiffs' injuries. This issue was not briefed, and is therefore waived. *See* TEX. R. APP. P. 38.1(i). Furthermore, Greg Evans, Southcross's Director of Operations for the Gulf Coast Region, testified that part of being experienced in operating a hot tap machine is experience with the "feel" of the machine in terms of the amount of sustainable pressure. Southcross's engineering expert testified that had Henneke adjusted the hot tap machine properly, the machine might not have exploded.

[8] Although Southcross presented evidence at trial that it made some effort to ensure Furmanite was sending a qualified technician by using the Veriforce system to check qualifications, Southcross does not challenge the breach element on appeal. *See* TEX. R. APP. P. 38.1(i).

"exceptionally dangerous." He also testified Southcross's written procedure on hot taps states, "Hot tapping is exceptionally hazardous."

Greg Evans, Southcross's Director of Operations for the Lower Gulf Coast, testified "hot tapping is inherently hazardous," which imposed an obligation on Southcross to "practice all due diligence." Boyer further testified there are also dangers when using alternatives to hot tapping, such as a "cold cut," because of the dangers presented by any residual natural gas. Thus, the evidence shows that regardless of which procedure was used to conduct repairs on the gas pipeline, the inherent dangers presented by natural gas would have been present. *See Prudential Fire Ins. Co. v. United Gas Corp.*, 199 S.W.2d 767, 772 (1946) (stating it "is generally known that natural gas is highly explosive and dangerous," and holding such dangers must be accounted for when considering a pipeline operator's standard of care).

Southcross's corporate representatives admitted hot tapping is inherently dangerous. Southcross also cites no evidence showing hot taps are not inherently dangerous. *See* TEX. R. APP. P. 38.1(i). Applying our standard of review, and considering the specific evidence in the record before us and the absence of on-point authority supporting Southcross's position, we cannot say— on this record—that hot taps are not inherently dangerous as a matter of law. Thus, if the duty rules regarding independent contractors apply, we alternatively hold there is sufficient evidence showing Southcross's duty to ensure the work was performed safely was nondelegable. *See Fifth Club*, 196 S.W.3d at 795. We therefore conclude the duty element of the jury's negligence finding is supported by legally sufficient evidence.

### 2. *Gross Negligence – Liability for Punitive Damages*

The jury found Gonzalez's and Elizondo's injuries resulted from gross negligence attributable to Southcross. Southcross argues the gross negligence finding is not supported by legally sufficient evidence. Southcross seeks a reversal of the trial court's award of exemplary

damages and rendition of a take-nothing judgment on the Gonzalezes' and Elizondo's gross negligence claims. *See* TEX. CIV. PRAC. & REM. CODE § 41.003(a)(3) (providing gross negligence gives rise to liability for exemplary damages).

Exemplary damages "are awarded as a penalty or by way of punishment but not for compensatory purposes." *Id.* § 41.001(5). The burden of proof for exemplary damages is clear and convincing evidence. *Id.* § 41.003(b). "'Clear and convincing' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 41.001(2). "Because of this heightened burden of proof, we apply a heightened standard of review." *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008). A plaintiff cannot satisfy this heightened evidentiary burden or shift the burden to the defendant "by evidence of ordinary negligence." *See* TEX. CIV. PRAC. & REM. CODE § 41.003(b).

### a. Applicable Law

"Gross negligence consists of both objective and subjective elements." *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012). "'Gross negligence' means an act or omission: (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others." TEX. CIV. PRAC. & REM. CODE § 41.001(11); *see Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001).

The jury charge tracked the statutory requirements for gross negligence, including both the objective and subjective components. However, the jury charge specifically limited the jury's consideration to the acts and omissions of Southcross's corporate safety officer, William Boyer:

Do you find by clear and convincing evidence that the harm to Jesus Gonzalez, Jr. and Rene Elizondo resulted from gross negligence attributable to Southcross?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Gross negligence" means an act or omission by William Boyer,

1. which when viewed objectively from the standpoint of William Boyer at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

2. of which William Boyer has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

You are further instructed that Southcross may be grossly negligent because of an act by William Boyer if, but only if (a) Southcross Energy Partners GP, LLC authorized the doing and the manner of the act, or (b) William Boyer was unfit and Southcross was reckless in employing him, or (c) William Boyer was employed as a vice-principal and was acting in the scope of employment, or (d) Southcross or a vice-principal of Southcross ratified or approved the act.

Because no party objected to the question being limited to Boyer's acts and omissions, we measure the legal sufficiency of the evidence by the charge as it was submitted to the jury. *See Sturges*, 52 S.W.3d at 715. In post-submission briefing, the parties agreed our review is limited to whether clear and convincing evidence shows Boyer was grossly negligent.

### b. The Parties' Arguments

Southcross challenges both the objective and subjective components of the jury's gross negligence finding. The Gonzalezes and Elizondo argue the extreme degree of risk involved was the risk of explosions during hot taps; Boyer was aware of the risk of explosions in conducting hot taps; and Boyer proceeded with conscious indifference by failing to follow industry standards recommended by the API before approving the expenses for the hot taps. Southcross argues there is not an extreme degree of risk associated with hot tapping, the risk in this case was created by Furmanite's negligent failure to maintain its hot tap machine, and no evidence shows Boyer was aware of this risk and proceeded with conscious indifference to this risk after approving the expenses for the hot taps.

### c. *"Act or Omission by William Boyer"*

We begin by considering how the jury was charged with respect to the Gonzalezes and Elizondo's theories of predicate negligence as they relate to the "act or omission of William Boyer." For an act or omission to constitute gross negligence, the act or omission complained of must first constitute ordinary negligence. *See Hogue*, 271 S.W.3d at 248. For gross negligence, "the act or omission complained of must depart from the ordinary standard of care to such an extent that it creates an extreme degree of risk of harming others." *Id.* Gross negligence therefore requires a predicate act or omission of ordinary negligence. *See id.*; *Kenyon*, 2020 WL 1540392, at *20. However, gross negligence requires more than ordinary negligence; for a negligent act or omission to constitute gross negligence, a jury must find both the objective and subjective components by clear and convincing evidence. *See* TEX. CIV. PRAC. & REM. CODE § 41.003(b); *Shell Oil Co. v. Humphrey*, 880 S.W.2d 170, 174 (Tex. App.—Houston [14th Dist.] 1994, writ denied).

In our analysis of the ordinary negligence claims, we held legally sufficient evidence shows Southcross owed a duty based on: (1) Henneke's contemporaneous activity of operating Furmanite's hot tap machine; (2) Henneke's control over Furmanite's work; and (3) to the extent Furmanite retained all control over the safety aspects of performing the hot taps, Southcross's nondelegable duty arising from the performance of the hot taps. The jury also found Furmanite's negligence proximately caused the injuries in this case. Regarding Furmanite's negligent acts and omissions that contributed to the injuries, the evidence shows Furmanite sent only one licensed technician to perform the hot taps when its safety policies required two for Southcross's valve replacement project, failed to maintain its hot tap machine, failed to pressure test its hot tap machine before the incident, and its employee Baker allowed a Southcross employee Henneke, a person not qualified to perform hot taps, to operate Furmanite's hot tap machine.

The Gonzalezes and Elizondo do not argue, and no evidence shows, Boyer was actually, subjectively aware of any of these negligent acts or omissions, and these negligent acts and omissions occurred after Boyer approved expenses for the hot tap. It is undisputed that Boyer is an employee of Southcross who works in Harris County and who was not present on the site in Duval County where the explosion occurred until the day after the explosion. No direct or circumstantial evidence shows Boyer actually knew, on the day of the explosion, whether Southcross employees were acting with reasonable prudence and following Southcross's written safety procedures. No direct or circumstantial evidence shows Boyer knew Furmanite violated its policies by sending only one technician, failed to pressure test and adequately maintain its hot tap machine, and allowed an unqualified Southcross employee to perform the hot tap.

Instead, the Gonzalezes and Elizondo argue the predicate negligence giving rise to gross negligence liability was Boyer's approval of expenses for the hot taps without analyzing the API standards and considering alternatives. Although we did not address whether Southcross owed a duty to Gonzalez and Elizondo based on Boyer's approval of expenses for the hot taps in analyzing ordinary negligence, we will assume Southcross owed such a duty in our analysis of whether sufficient evidence supports the gross negligence finding. We also assume without deciding legally sufficient evidence supports the objective component of the jury's gross negligence finding, and proceed to considering the subjective component.

### d. The Subjective Component

To establish the subjective component of gross negligence, "the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrate that he did not care" in "proceeding" with conscious indifference. *Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164, 173 (Tex. 2005). The "conscious indifference" test focuses on the actor's mental state. *Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 325 (Tex. 1993). Circumstantial evidence may be

sufficient to show an actor's mental state. *See Lee Lewis Constr.*, 70 S.W.3d at 785. However, the evidence must show the actor was subjectively aware not only of the magnitude of potential harm, but also a high probability of potential harm. *See Alexander*, 868 S.W.2d at 325 (requiring proof the actor "proceeded with knowledge that harm was a 'highly probable' consequence").

The parties dispute whether the evidence shows Boyer, personally, applied the API standards and considered alternatives to hot tapping. We will assume the evidence shows Boyer failed to follow the API standards and that he was negligent in personally failing to do so.[9] We will also assume the evidence shows no other Southcross employee involved in the valve replacement project followed the API standards and considered alternatives to hot tapping. But some evidence of ordinary negligence, such as evidence that an actor negligently failed to take a safety precaution, is insufficient under the clear and convincing standard to show the actor was subjectively aware his negligence created an extreme degree of risk and nevertheless proceeded with conscious indifference to that risk. *See Lee Lewis Constr., Inc.*, 70 S.W.3d at 785. "Conversely, some evidence of care does not defeat a gross-negligence finding." *Id.*

No evidence shows that when Boyer emailed his approval of expenses for the hot taps, he knowingly failed to analyze the API standards, and approved the expenses for hot taps with indifference to whether any Southcross employee involved in the valve replacement project had analyzed the API standards. Although the Gonzalezes' and Elizondo's petroleum engineering expert, Greg Perkin, testified a pipeline operator, as an entity, should apply the API standards and consider alternatives to a hot tap, no evidence shows such an analysis must be, should be, or ordinarily is conducted personally by the pipeline operator's highest corporate safety officer. In

---

[9] During his testimony, Boyer was evasive and expressed uncertainty about whether the hot taps were necessary under the API standards. The jury reasonably could have inferred that if Boyer was uncertain about how the API standards applied to the valve replacement project at the time of trial, he more likely than not did not know whether the hot taps were necessary when he approved the Authorization for Expenses.

other words, if any Southcross employee involved in the valve replacement project had considered the API standards and determined a hot tap was required, Southcross would have met the standard of care argued by the Gonzalezes and Elizondo, even if Boyer did not consider the API standards personally.

Although we assume the evidence shows Boyer did not consider the API standards, and that no other Southcross employee did so, we will determine whether the evidence shows Boyer was subjectively aware that no one at Southcross had considered the API standards when determining whether the valve replacement project required hot taps. Before approving expenses for the hot taps, the documentation provided to Boyer consisted of the AFE form and the emails pertaining to the AFE form. The emails did not contain any analysis of the API standards. The AFE form contained a list of expected expenses and the following project description and justification:



Although the AFE form does not reflect an analysis of the API standards, there is no evidence showing an analysis of the API standards is typically reflected on the AFE forms submitted for corporate approval. The AFE form, which was prepared by other Southcross employees, states the valve replacement project will "require" two hot taps. Thus, while the AFE form is circumstantial evidence showing Boyer was aware no analysis of the API was *documented* on the AFE form itself, a jury could not reasonably infer from the AFE form—alone—that Boyer was subjectively aware that all other Southcross employees involved in the valve replacement project had failed to analyze the API standards for considering alternatives to a hot tap when concluding the valve replacement project will "require" two hot taps.

Additionally, our heightened standard of review precludes us from diregarding undisputed facts in considering the sufficiency of evidence suporting a gross negligence finding. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). It is undisputed that the API standards relate to the reasonableness of performing hot taps, and involve weighing not only safety considerations, but also the feasibility and service-interruption implications of shutting down a gas pipeline. Specifically, the first two API standards involve considering the feasibility of shutting the pipeline down and the necessity of service continuity. The last three API standards involve logistics and safety considerations for hot taps; specifically, whether written hot tap procedures are available; whether special equipment for performing hot taps is available; and whether the equipment will provide proven effective protection for employees.

The Gonzalezes and Elizondo posit that the evidence shows Boyer did not consider, or sufficiently consider, the API standard of whether a system shutdown was feasible. Assuming this position is supported by the evidence, this position would merely establish Boyer failed to consider the feasibility of alternatives, not necessarily that Boyer failed to consider the API standards related to *safety*. The Gonzalezes and Elizondo argue that action in the face of a known risk can establish

conscious indifference. But in the cases upon which they rely, the actor was aware a certain *safety* precaution was not being taken in the face of known risk. *See Hogue*, 271 S.W.3d at 253 (evidence showed defendant was subjectively aware of the lack of sufficient medical resources, which created an extreme risk); *Lee Lewis Constr.*, 70 S.W.3d at 786 (defendant personally observed an "ineffective fall-protection system" on construction of a high rise); *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 924 (Tex. 1998) ("Mobil vice principals knew that not providing protective gear, not monitoring and not warning workers about benzene exposure was an extreme risk to contract workers").

This case is distinguishable because there is no evidence showing Boyer was subjectively aware that a *safety* precaution was not taken. Instead, the evidence conclusively establishes undisputed facts related to the *safety* recommendations contained in the last three API standards. It is undisputed Southcross had written, detailed procedures for hot taps;[10] in approving expenses, Boyer was approving the hiring of a contractor, Furmanite, who had experience with and special equipment for performing hot taps; Southcross had used Furmanite's hot tapping services in the past without any safety incidents; and the API standards acknowledge hot taps are frequently performed safely. There is no evidence showing that, at the time Boyer approved expenses for the hot taps for the valve replacement project, the hot taps for the project presented a higher probability of explosions than any other hot tap, or that Boyer was aware of any such heightened probability based on a likelihood that Southcross's and Furmanite's employees would not follow all written safety procedures. *See Agrium U.S., Inc. v. Clark*, 179 S.W.3d 765, 768 (Tex. App.—Amarillo

---

[10] Although several of those procedures were not followed on the day the hot taps were performed, as explained above, the Gonzalezes and Elizondo do not argue, and there is no evidence showing, Boyer was subjectively aware Southcross's written procedures were not followed.

2005, pet. denied) (considering the existence of safety procedures as relevant to conscious indifference).[11]

The Gonzalezes and Elizondo argue, however, Boyer's conscious indifference was shown by a Powerpoint document Boyer referred to during a presentation at a conference of energy executives. The Powerpoint is dated July 2017, over a year after the April 2016 explosion. In their briefs, the Gonzalezes and Elizondo isolate quotes from the Powerpoint, and argue these quotes show Boyer's subjective state of mind is one of someone who does not care about the rights, safety, or welfare of those injured in accidents involving oil and gas pipelines:

> During a private conference on maintaining a company's image, Boyer told oil executives that "significant incident[s]" are inevitable and "it is just a matter of time before you will have [one]." When such an "incident" does occur, he advised, operators should "[e]mphasize that it was an accident and unfortunate." It is important, he continued, to "convey genuine interest in repairing the damage and finding the cause of the incident." In private, Boyer said nothing about actually repairing the damage, finding the root cause, or avoiding catastrophes in the first place.

(citations omitted). The Powerpoint, titled "Pipeline Operations in the era of 'new Media': 'What happens when things go really wrong'?" consists of several slides relating to how social media posts pertaining to pipeline accidents can interfere with a company's post-accident public relations strategy. Merely discussing public relations strategies for *after* a catastrophic accident does not necessarily show conscious indifference to the rights, safety, and welfare of workers *before* such an accident occurs, which is what is required for gross negligence. *See* TEX. CIV. PRAC. & REM. CODE § 41.001(11).

---

[11] The *Agrium* court noted, "It is beyond doubt that other measures could have been taken by all involved to prevent the incident or reduce the risk involved. But what cannot be ignored is the fact that Agrium had in place procedures which obviated the danger inherent in working on pressurized lines. And, we find no evidence of record suggesting that had those procedures been completely followed, the incident would have nonetheless occurred. Nor did we find evidence that like incidents had occurred in the past despite full compliance with the procedures." *Id.* The same is true in this case.

In sum, the charge limited the jury's consideration to the acts and omissions of Boyer. The evidence on which the Gonzalezes and Elizondo rely to show Boyer's ordinary negligence—failing to apply the API standards or to consider alternatives to a hot tap—is the same evidence they rely on to show Boyer was consciously indifferent and thus grossly negligent. But some evidence of ordinary negligence under a preponderance standard is insufficient to show gross negligence under the clear-and-convincing-evidence standard. Even if Boyer did not adequately consider the feasibility of alternatives to hot taps, the undisputed facts establish Southcross had written safety procedures for hot taps and, by approving the AFE form, Boyer was relying on Furmanite to perform the hot taps with its equipment and qualified personnel. No evidence shows Boyer was personally aware that other Southcross and Furmanite employees failed to comply with Southcross's or Furmanite's safety policies and procedures during this incident or in the past. Applying our heightened standard of review, accounting for the undisputed facts in this case, and having thoroughly considered all of the evidence arguably relevant to the gross negligence finding, we cannot say the conscious indifference element of the jury's gross negligence finding regarding Boyer is supported by legally sufficient evidence. We are therefore compelled to reverse the award of punitive damages.

### THE GONZALEZES' CROSS-APPEAL

The Gonzalezes argue the trial court erred by denying their motion for new trial because a juror, Juror 6, was disqualified. In their motion for new trial, the Gonzalezes argued Juror 6 was disqualified because she was a resident of Nueces County, not Duval County where the trial was held. "A person is disqualified to serve as a petit juror unless the person . . . is a resident of . . . the county in which the person is to serve as a juror." TEX. GOV'T CODE § 62.102(3).

The Gonzalezes did not object or make a for-cause challenge to Juror 6's qualifications to serve on the jury during voir dire. The Gonzalezes claim they were injured by Juror 6 being one

of the ten jurors who determined the amount of compensatory damages. Juror 6, along with the other eleven members of the jury, found Southcross liable for gross negligence and determined the amount of punitive damages. Southcross argues the Gonzalezes did not preserve error, the trial court did not abuse its discretion, and the Gonzalezes were not harmed.

We review a trial court's denial of a motion for new trial based on a juror's disqualification for an abuse of discretion. *BZ Tire Shop v. Brite*, 387 S.W.3d 837, 838 (Tex. App.—San Antonio 2012, no pet.). A trial court does not abuse its discretion if its decision is based on conflicting evidence. *Frezza v. Flores*, 567 S.W.3d 417, 420 (Tex. App.—San Antonio 2018, pet. denied). And, we do not substitute our opinion for the trial court's. *Keeton v. Carrasco*, 53 S.W.3d 13, 25 (Tex. App.—San Antonio 2001, pet. denied).[12]

In her juror questionnaire, Juror 6 wrote her county of residence is Duval County. She signed the questionnaire certifying her answers to all questions were true and correct. During voir dire, Juror 6 stated under oath that she worked in Nueces County, where she drove every day except a few days a week, and then she would drive back to stay with her parents who lived in Duval County. The record also contains a copy of Juror 6's driver's license, showing her address is in Duval County, and her voter registration form from 2016 on which she represented under penalty of perjury that she resided in Duval County.

Although the Gonzalezes rely on Juror 6's testimony, the testimony of her mother and stepfather, and documentary evidence, there is conflicting evidence in the record. Each side presented a significant amount of evidence on which county Juror 6 intended to be her residence.

---

[12] In the Gonzalezes' brief, they argue, "The abuse of discretion standard of review applies." At oral argument, the Gonzalezes argued the standard of review is de novo because the trial court applied an improper construction of the statute imposing the juror residency requirement. The Gonzalezes rely on comments the trial court made during the new trial hearing, but "oral comments from the bench are not written findings of fact." *In re Doe 10*, 78 S.W.3d 338, 340 n.2 (Tex. 2002). Nevertheless, on the legal issue of what "residence" means, we will assume the Gonzalezes' proposed construction of "residence" is proper, and that "residence" means a person's home—the fixed place of habitation to which they intend to return after any temporary absence.

Because the evidence is conflicting, we cannot substitute our judgment for the trial court's or say the trial court abused its discretion by denying the Gonzalezes' motion for new trial. *See Frezza*, 567 S.W.3d at 420; *Brite*, 387 S.W.3d at 838; *Keeton*, 53 S.W.3d at 25.

## CONCLUSION

We reverse the exemplary damages awards and render a take-nothing judgment on the Gonzalezes and Elizondo's gross negligence claims. In all other respects, the trial court's judgment is affirmed.

Luz Elena D. Chapa, Justice